## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

In re:

        Deloris V. Victoria,
        Debtor.                **Bankruptcy Case. No. 06-31225-WRS**


        Deloris V. Victoria,
        Appellant

        vs.                    **Civil Action No. 2:07-cv-00699-WKW**

        Greenville Hospital Corporation
        Appellee


## TRANSMITTAL OF APPELLEE DESIGNATION OF CONTENTS
## ITEM #20 AND ITEM # 21 TRANSCRIPTS

      I, Dianne M. Segrest,  do hereby certify that the documents herein comprise the items in the designation of contents related to the Notice of Appeal filed in the above referenced case.

**Transmittal Submitted On**:      September 4,  2007

**Contents of Record**:
**Designated Item #20**         **Transcript of Section 341 Meeting held 11-29-2006**
**Designated Item #21**         **Transcript of Cont'd Section 341 Meeting held 12-15-2006**


**REMARK:**
**ITEMS #20 AND #21 SUBMITTED 8/31/2007 (SEE BK DOCKET #97 AND #98.)**
**PLEASE ACKNOWLEDGE RECEIPT OF TRANSMITTED APPELLEE DESIGNATION ITEMS #20 AND ITEMS #21.**

    /s/ Richard S. Oda, Clerk
    United States Bankruptcy Court

    /s/Dianne M. Segrest
    Deputy Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---

In the matter of:         )
                           )
Deloris V. Victoria,     ) Case No. 06-31225
                           ) Montgomery, AL
    Debtor.          ) October 27, 2006

---

TRANSCRIPT OF 341 MEETING OF CREDITORS

APPEARANCES:

Daniel G. Hamm, Trustee
The Law Offices of Daniel G. Hamm
560 South McDonough St., Ste A
Montgomery, AL 36104

Richard D. Shinbaum
Shinbaum, Abell, McLeod & Vann
P.O. Box 201
Montgomery, AL 36101

Teresa Jacobs
Bankruptcy Administrator's Office
One Church Street
Montgomery, AL 36104

Greer B. Mallette
Christian & Small LLP
1800 Financial Center
505 North 20th Street
Birmingham, Alabama 35203

---

Transcriber:                Patricia Basham
                            6411 Quail Ridge Drive
                            Bartlett, TN  38135
                            901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

```
 1              (DELORIS V. VICTORIA, DEBTOR, PREVIOUSLY SWORN)

 2                            EXAMINATION

 3     BY MR. HAMM:

 4     Q.        Deloris Victoria.

 5     A.        Good morning, sir.

 6     Q.        Good morning.  State your name and address, please.

 7     A.        Deloris Victoria, 225 Woodland Heights, Greenville,

 8     Alabama.

 9     Q.        Ms. Victoria, you took the oath earlier?

10     A.        Sir?

11     Q.        You took the oath earlier?

12     A.        Yes.

13     Q.        Do you own the property at 225 Woodland Heights Drive

14     in  Greenville, Alabama?

15     A.        Yes, sir.

16     Q.        How long have you lived at that address?

17     A.        Nine years.

18     Q.        Have you ever filed a bankruptcy case before?

19     A.        No, sir.

20     Q.        Tell me about the property.  You have some real estate

21     in Orlando, Florida.  Tell me about that.  Is it a fee simple

22     ownership?

23     A.        It is a timeshare.

24     Q.        It is a timeshare, okay.  How long have you owned

25     that?
```

3

| | | |
|---|---|---|
| 1 | A. | Twenty years. |
| 2 | Q. | Okay.  Is there a monthly maintenance fee on that? |
| 3 | A. | Yearly. |
| 4 | Q. | How much is that maintenance fee? |
| 5 | A. | Six hundred dollars. |
| 6 | Q. | And you are current with that; is that correct? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Is that property financed in any manner? |
| 9 | A. | No, sir. |
| 10 | Q. | Okay.  Let me ask you about the home that you live in, |
| 11 | | which I take is the 225 Woodland Heights Drive home; is that |
| 12 | | correct? |
| 13 | A. | Yes, sir. |
| 14 | Q. | Do you own that yourself? |
| 15 | A. | Me and my husband. |
| 16 | Q. | You and your husband, it is jointly owned? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And you live there; is that correct? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Have you ever tried to sell that home? |
| 21 | A. | No, sir. |
| 22 | Q. | When was it last financed or refinanced? |
| 23 | A. | I think we have the same original – |
| 24 | Q. | The original financing from nine years ago? |
| 25 | A. | Right. |

4

1    Q.      How did you go about establishing the value?  It is

2    the tax assessor's value?

3    A.      (No response.)

4    Q.      You obtained the three hundred and seventy-three

5    thousand dollar value from the tax assessor's office, or do you

6    know?

7    A.      I think it is.

8    Q.      If you were going to put the home on the market today,

9    what do you think you would list it for?  What would you be

10    asking for the home?

11    A.      Three hundred.

12          MS. JACOBS: Mr. Hamm, I am sorry, we can't hear.

13          MR. HAMM: Okay.  You are going to have to speak up

14    some.

15          MS. JACOBS: You are going to have to speak up into the

16    microphone.

17    Q.      If you were going to list the home for sale, what

18    would you be asking for the home?

19    A.      About three hundred.

20    Q.      Three hundred thousand dollars, and how do you come

21    about arriving at that value?  Why three hundred?

22    A.      Because neighbors that are selling their house could

23    not sell it over three hundred.

24    Q.      And is your home comparable to those in the

25    neighborhood?

5

1    A.       Yes, sir.

2    Q.       I notice there are some tax claims in this case, IRS

3    claims.  How did those come about?

4    A.       It is when I had three employees that are physicians

5    and we could not make payments.

6    Q.       The withholding, this is their withholding taxes; is

7    that correct?

8    A.       Right.

9    Q.       Not your income taxes; it would be withholding taxes?

10   A.       Uh-huh.

11   Q.       Other than the two pieces of real estate, the

12   timeshare and the 225 Woodland Heights Drive property, have you

13   had an ownership interest of any type in any other real estate

14   in the last four years, house, land, or building of any type?

15   A.       No, sir.

16   Q.       Do you currently practice medicine?

17   A.       Yes, sir.

18   Q.       Do you own the building that you are practicing in?

19   A.       No, sir, we are renting.

20   Q.       You are renting that.  I am noticing various items of

21   personal belongings, your household goods, your checking

22   accounts at Whitney and Butler County Bank, your clothing items

23   and jewelry items, your retirement plan with your – I take it

24   that is associated with your business, your retirement plan; is

25   that correct?

6

1     A.      Yes, sir.

2     Q.      And a breach of contract against a fellow doctor.  Is

3     this everything that you own?

4     A.      Yes, sir.

5     Q.      You reviewed these schedules prior to filing them; is

6     that correct?

7     A.      Yes, sir.

8     Q.      Okay.  I am noticing some computers, EGA tables and

9     chairs.  This must be the equipment in your medical practice?

10    A.      Right.

11            MR. HAMM: Ms. Jacobs, do you have any questions on

12    this case?  I'm going to have some more.  Any creditors here?

13            MR. MALLETTE: Mr. Hamm, I am Greer Mallette and I

14    represent Greenville Hospital, a creditor.

15            MR. HAMM: Do you have any questions?

16            MR. MALLETTE: Yes, sir, a number of questions.  You

17    may want to go first.

18            MR. HAMM: No, go ahead.  I am going to be looking at

19    some other items.  Go ahead.

20    BY MR. MALLETTE:

21    Q.      Dr. Victoria, where are you from?

22    A.      Excuse me.  What is your name, sir?

23    Q.      My name is Greer Mallette and I represent Greenville

24    Hospital.

25    A.      Hello.

7

1   Q.       Where are you from, Dr. Victoria?

2   A.       I am originally from the Philippines.

3   Q.       Do you still have family there?

4   A.       Yes, sir.

5   Q.       How often do you go and visit them?

6   A.       The first time was '83; the second time, '89; and then

7   we went back in 2002 and 2004.  Four times.

8   Q.       Are you sure you haven't been within the past year?

9   Your attorney has represented to me that you spent several

10  weeks there back in the spring?

11  A.       That is what I was telling you, that we were there in

12  January, 2006.

13  Q.       January 2006?

14  A.       Right, uh-huh.

15  Q.       Do you own any property in the Philippines?

16  A.       No.

17  Q.       Do you own any personal property in the Philippines?

18  A.       No.

19  Q.       And no real estate?

20  A.       No.

21  Q.       When you visited in January of 2006, did you carry any

22  cash with you or any money with you, assets?

23  A.       No, just money to spend.

24  Q.       You don't have any bank accounts in the Philippines?

25  A.       No.

8

1    Q.      What is the name of your family in the Philippines?

2    A.      I was Villamor, V-I-L-L-A-M-O-R.

3    Q.      What is that first name?

4    A.      Dolores, D-O-L-O-R-E-S.

5    Q.      And what town or area does she reside?

6    A.      I came from Lopez, L-O-P-E-Z, Quezon, Q-U-E-Z-O-N.

7    Q.      And who is that, your sister?

8    A.      I have four sisters.

9    Q.      Okay.  So who is Dolores Villamor?

10    A.      I am.

11    Q.      I am sorry.  Who is your family in the Philippines?

12    A.      Oh, I am sorry.  I have one sister, Josephine

13  Villamor.

14    Q.      Is that her married name?

15    A.      She is not married.

16    Q.      Okay.  That is one sister.  You said you have other

17  sisters there.  What are their names?

18    A.      Belinda, B-E-L-I-N-D-A, and I have Jredilda, J-R-E-D-

19  I-L-D-A, and I have Mater, M-A-T-E-R, Villamor.

20    Q.      Okay.  And the last question on this, what area did

21  you say that that is, Lopez; is that the area they reside?

22    A.      Yes.

23    Q.      Dr. Victoria, you showed you have a four thousand

24  dollar a month mortgage payment in your schedules?

25    A.      Yes, sir.

9

1    Q.       Is that the minimum due under your mortgage; is that

2    the minimum amount you have to pay to the bank each month under

3    your mortgage?

4    A.       Monthly payment.

5    Q.       Is that a thirty-year or fifteen-year mortgage; do you

6    know?

7    A.       I think it is nine years.

8    Q.       Nine-year mortgage.  You have nine years left on it,

9    or it was nine years when you took it out?

10   A.       When we took it out, it was like fifteen years.

11   Q.       Okay.

12            MR. HAMM: According to the bank, her balance is two

13   eighty-five, one seventy-four, and the monthly payment is two

14   thousand twenty-five eighty-five.

15   Q.       Dr. Victoria, and your attorney may be able to tell us

16   this, you have listed Greenville Hospital as an unsecured

17   creditor.  Are you aware that we have enrolled our judgment in

18   the probate court at the time that you filed?

19   A.       (No response.)

20   Q.        That we enrolled that.  It was about two months ago.

21   It was within ninety days, correct.

22            MR. HAMM: It was within the ninety-day period?

23            MR. MALLETTE: It was within the ninety-day period,

24   yes, sir.

25   BY MR. MALLETTE:

10

1    Q.        Dr. Victoria, you didn't list the lease with

2    Greenville Hospital Corporation in your schedules as an asset.

3    Do you intend to affirm that lease?

4    A.        (No response.)

5    Q.        Or assume that lease.

6    A.        Say it again.

7    Q.        Do you intend to continue renting from Greenville

8    Hospital?

9    A.        Yes.

10   Q.        You do?  Dr. Victoria, you list in your Schedule "J"

11   on the current expenditures twelve hundred a month for auto

12   insurance.

13   A.        Say it again.

14   Q.        You list twelve hundred a month for auto insurance,

15   yet you list no autos as an asset. What is that insurance paid

16   on?

17   A.        It is my husband's.

18   Q.        So you are paying for your husband's insurance?

19   A.        I am not paying.  My husband is paying.

20   Q.        Okay.  But you list that, I believe, as a part of

21   your expenditures?

22   A.        Yeah.  I think because we listed it as joint.

23   Q.        Okay.  You listed –

24            MR. HAMM: Do you know how many more questions you

25   might have?  And I am not trying to rush you – well, I am.

11

1    Generally we confine these to – and I know you are looking at

2    the schedules, the assets and the liabilities and your

3    potential claim.  Have you any questions that – how much longer

4    do you think you will be?

5            MR. MALLETTE: About two minutes.

6            MR. HAMM: Okay.  Well, I am going to put this case at

7    the end of the docket.

8            MR. MALLETTE: That's fine.

9            MR. HAMM: Let me finish up with Dr. Victoria right

10   now.

11   BY MR. HAMM:

12   Q.        Dr. Victoria, I am noticing some payments to

13   creditors in excess of six hundred dollars, that MBNA payment.

14   Have there been any other payments to creditors other than the

15   MBNA payment in the ninety days prior to filing the petition?

16   A.        I have been paying the banks.

17   Q.        Okay.  On your mortgage?

18   A.        Right.

19   Q.        And rent at your office and such as that, I take it?

20   A.        Right, uh-huh.

21   Q.        Anything else?

22   A.        (Inaudible)

23   Q.        Okay.  Have you repaid any loans to family members

24   within the past year?

25   A.        No.

12

1    Q.        Does anyone owe you any money for any reason other

2    than the receivables in your medical practice?

3    A.        No.

4    Q.        Do you have money owed to you from your medical

5    practice?

6    A.        No.

7    Q.        You do not?  Does anyone owe you money in your

8    medical practice?

9    A.        Oh, a lot.

10   Q.        A lot, and how much –

11   A.        Insurance maybe.

12   Q.        How much?

13   A.        Insurance.

14   Q.        How much money would that be?  How much are you

15   expecting from insurance companies today?

16   A.        Thirty, forty thousand.

17            MS. JACOBS: I didn't hear the answer.

18            MR. HAMM: It was thirty to forty thousand dollars, I

19   believe.

20   Q.        Is that correct, Dr. Victoria?

21   A.        Yeah.

22   Q.        And what insurance, Blue Cross Blue Shield and

23   Medicare, Medicaid?

24   A.        Medicaid and Medicare.

25   Q.        Anybody else?

13

1   A.        No, sir.

2   Q.        I would ask that, when these monies come in, that you

3   hold those monies and report them – first of all, you practice

4   as a sole proprietor; is that correct?

5   A.        Solo practice?

6   Q.        Yes.

7   A.        Yes, sir.

8   Q.        You don't practice through a corporation; do you?

9   A.        No.

10  Q.        I would ask that you hold all of the monies that are

11  coming in and you bring those checks to Mr. Shinbaum's office,

12  okay.  I would also ask for you to provide us with an

13  accounting of those receivables, an approximate amount of those

14  receivables in the last three to six weeks.  Can you do that

15  for us?

16  A.        Yes, uh-huh.  Give me like what time frame?

17  Q.        Well, I am going to be looking back three to six

18  weeks.  The date of the filing is the operative date.

19  A.        Okay.

20  Q.        But I want to take a look at those receivables over

21  that period of time, at least.  I will be talking with Mr.

22  Shinbaum some more.  We are going to continue this case until

23  November 29 at nine o'clock.

24        MS. JACOBS: Mr. Hamm, I want to continue on with

25  questions about her assets and liabilities.

14

1          MR. HAMM: Sure.  That's fine.

2          MS. JACOBS: Today.

3          MR. HAMM: Okay.  Do you want me to go ahead and clear

4    out these other cases?

5          MS. JACOBS: No, let's just do it.

6          MR. HAMM: Okay.  Go ahead, then.

7    BY MR. MALLETTE:

8    Q.       You say you own no vehicles but you are making the

9    insurance payments, or are you saying that that should have

10   been identified as a payment your husband makes?

11   A.       Yeah, I do not own any cars.  It is all his cars.  We

12   listed it as a joint, if you notice it.

13   Q.       What are the debts that you list as being owed to

14   your spouse, thirty-five hundred dollars?

15   A.       My debts?  I would have to look at that one to make

16   sure.  I don't know if you have the list wherein I pay my part

17   and then he pays his part.

18   Q.        Okay.   What  is  the  seven  hundred  dollars  for

19   transportation?

20   A.       This is on my part?

21   Q.       Your current expenditures for individual debtors.

22   A.       I am not sure.

23   Q.       Do you drive, Dr. Victoria?

24   A.       Sometimes.

25   Q.       Okay.  Charitable contributions, you list that you

15

1    make a thousand dollars in charitable contributions each month.

2    A.        Yes, sir.

3    Q.        But you don't list where you made any of those in the

4    past year.  To whom do you pay a thousand dollars each month in

5    charitable contributions?

6    A.        Churches.

7    Q.        Which churches are those?

8    A.        We have St. Elizabeth Church in Greenville.  We have

9    Sacred Heart Church in Atlanta and Rocket Church in Atlanta,

10   also.

11   Q.        And you have been making payments to those churches

12   over the last year?

13   A.        Yes, sir.

14             MR. MALLETTE: That's all I have got, Dr. Victoria.

15   Thank you.

16             MS. JACOBS: Let me ask a few questions.

17   BY MS. JACOBS:

18   Q.        I am Teresa Jacobs from the bankruptcy administrator,

19   and I have already spoken to Mr. Shinbaum about seeing evidence

20   of the balances on the debts that are listed in your case.  You

21   said that you purchased your home in Greenville nine years ago;

22   is that right?

23   A.        Yes, ma'am.

24   Q.        It has not been refinanced?

25   A.        No.

16

1    Q.        And the balance is about two eighty-five on the
2    mortgage?
3    A.        Yes, ma'am.
4    Q.        And the mortgage is joint with your husband?
5    A.        Yes, ma'am.
6              MS. JACOBS: That's not reflected on the schedules,
7    Mr. Shinbaum.
8    Q.        Let me ask you about your household goods.  What does
9    that consist of?
10   A.        Furniture, bedroom furniture, drapes, beddings.
11   Q.        Do you have antiques?
12   A.        No.
13   Q.        Do you have silver?
14   A.        A few.
15   Q.        Flatware or silver pieces?
16   A.        Pieces.
17   Q.        You listed the value of your household goods as seven
18   thousand dollars?
19   A.        Yes, uh-huh.
20   Q.        Do you have jewelry?
21   A.        Yes.
22   Q.        What does that consist of?
23   A.        Necklace, earrings.
24   Q.        Are those jewelry items that you wear routinely or
25   are they locked up in a safe deposit box?

17

1    A.        No, I have given them to the children.

2    Q.        How many children do you have?

3    A.        We have four.

4    Q.        Where do they live?

5    A.        One in California, L.A.; one in Daytona Beach,

6    Florida.

7    Q.        When did you make gifts of jewelry to your children?

8    A.        It is still with me but I am keeping it until I pass

9    or something.

10    Q.        Is it in a safe deposit box?

11    A.        I have it at home.

12    Q.        Okay.  Do you have any firearms?

13    A.        We have, yes.

14    Q.        How many?

15    A.        I am not sure.  It is like up in the firearm, in the

16    safe.

17    Q.        You need to get that information to your attorney.

18    Do you have any insurance policies that have cash value?

19    A.        It is term insurance.

20    Q.        Did you say term?

21    A.        Term insurance.

22    Q.        Are any of the children under twenty-one?

23    A.        No.

24    Q.        For interest in pension or profit-sharing plans, the

25    SEP is there. I don't know what that means.

18

1    A.      It is SEP.

2           MR. HAMM: SEP stands for simplified employee plan. It

3    is going to be some type -  I would venture to guess it is some

4    type of (inaudible).

5           MS. JACOBS: Well, I want to see some information on

6    what that plan is, the nature of it.

7    BY MS. JACOBS:

8    Q.      Do you own any stocks?

9    A.      No.

10   Q.      You said that your practice does have accounts

11   receivable, money that's owed to you?

12   A.      Yeah, uh-huh.

13   Q.      I assume that Mr. Hamm wants anything that was owed to

14   you for services rendered prior to the date the petition was

15   filed.

16          MR. HAMM: I think I was asking that the checks be

17   turned over to Mr. Shinbaum, all of those checks and an

18   accounting of what was owed on the date of the petition filing.

19   BY MS. JACOBS:

20   Q.      Does anybody else owe you any money?

21   A.      No.

22   Q.      Do you have a cause of action or a reason to sue

23   anybody?

24   A.      No.

25          MR. SHINBAUM: Yes, she does but it is probably

19

1   uncollectible.  That is the suit against the doctor she had in

2   her office that left which caused the judgment with Greenville

3   Hospital and suit with Greenville Hospital.  The doctor was a

4   Romanian doctor with very little assets and it is probably

5   uncollectible but she would technically owe the money to Dr.

6   Victoria.

7          MR. HAMM: There is a hundred and sixty-eight thousand

8   dollar claim against her.  Would that be a counter-claim in

9   that suit?

10          MR. SHINBAUM: It would be a third-party counter-claim

11   if it was collectible.  Rich Hartley is handling that for her.

12   I don't know if he is going to pursue it or not but, if you are

13   asking does she have a cause of action, she does.  Whether or

14   not it is any good is another question.

15   BY MS. JACOBS:

16   Q.      Do you know where that doctor is located?

17   A.      Yes, ma'am.

18   Q.      Where?

19   A.      In Charlotte, North Carolina.

20   Q.      I am sorry?

21   A.      Charlotte, North Carolina.

22   Q.      Okay.  What vehicles does your husband own?

23   A.      He has a couple of Mercedes.

24   Q.      What year?

25   A.      2003 and 2000.

20

1    Q.        And is it your testimony that your name is not on the

2    title to either vehicle?

3    A.        No.

4    Q.        Are those the only vehicles in the household?

5    A.        Ma'am.

6    Q.        Are they the only vehicles in your household?

7    A.        Yeah.  And my son has one.

8    Q.        But it is in his name?

9    A.        It is his name, yes.

10   Q.        Do you have any recreational vehicles, any boats?

11   A.        No.

12   Q.        Or campers or airplanes?

13   A.        No.

14   Q.        What is the lawsuit with Genezen Healthcare about?

15   A.         When the other doctor is under me, they have

16   treatment that they are doing every week in the office and the

17   payments from the insurance company goes to an account and what

18   - and they pay everything else, the material, their employees,

19   but none is given to the doctor that is working for me.  So

20   when he left, what I did is I kept the rest of the money that

21   was paid for the services that he provided for the patients.

22   Q.        And they are suing you?

23   A.        Right, yeah, uh-huh.

24   Q.        Tell me about MBNA.  You say that you have a non-

25   consumer business account?

21

1    A.        Yeah.  I borrowed that from my husband so I can

2    afford for the expenses.

3    Q.        No, this is a creditor, MBNA.  I assume it is a

4    credit card.  Show that to your attorney.  I want to see what

5    the name is on the card.  Is it your name?

6    A.        Yeah.  He knows it.

7    Q.        And this gentleman was asking you about a lease with

8    Greenville Hospital.  Is that where your practice is?

9    A.        Yes, ma'am.

10    Q.        Do you operate out of any other location in a

11    hospital?

12    A.        Other location in the hospital?

13    Q.        Is the hospital the only location where you practice?

14    Do you have another clinic or office?

15    A.        I have another clinic but it is in the early stage.

16    Q.        Do you have a lease on the premises?

17    A.        No, ma'am.

18    Q.        Where is it?

19    A.        It's in my husband's office.  I just go there a half

20    day a week.

21    Q.        Where is that?

22    A.        In Luverne.

23    Q.        Did you sign a lease with Greenville Hospital?

24    A.        I did.

25    Q.        Do you have any other unexpired leases?

22

1    A.        No, ma'am.

2    Q.        Do you have any equipment that you lease?

3    A.        No, ma'am.

4    Q.        Do you have a cellular telephone you lease?

5    A.        No, ma'am.

6    Q.        Or have a contract phone?

7    A.        No, ma'am.

8    Q.        And you don't have a professional corporation; right?

9    A.        We started one in July of two thousand – just the

10   past two months.

11   Q.        And so prior to that time, you were in business as a

12   sole practitioner, individually?

13   A.        It is working this way: I am solo practice but I am

14   working under the umbrella of Bariatric.  It's a weight-loss

15   clinic, wellness.

16             MS. JACOBS: Go ahead.

17   BY MR. HAMM:

18   Q.        Dr. Victoria, let me ask you, the checks that will be

19   coming from Blue Cross Blue Shield, Medicaid and Medicare,

20   those providers, insurers out there, how will they be made

21   payable?

22   A.        Payable to me.

23   Q.        To you, individually, they will have your name on

24   those?

25   A.        Yes.

23

1    Q.        And it has been that way for a long time, I take it,
2    right?

3    A.        Yes, sir.

4    Q.        The PC, you have not begun conducting business under
5    that name as of yet; is that correct?

6    A.        We are in the early stage.

7    Q.        Okay.  You have not notified Blue Cross Blue Shield?

8    A.        No, not yet.

9    Q.        All of those providers?

10   A.        No, uh-uh.

11   Q.        And the equipment was purchased by you as an
12   individual?

13   A.        (Inaudible)

14   Q.        And I take it all of the receivables, that money that
15   you have made, the monies that people owe you for, that comes
16   from your individual efforts; is that correct, not the efforts
17   of your husband or anyone else?

18   A.        No, sir.

19   Q.        Okay.  For everyone's information, I have been
20   provided three letters that are addressed to the judge, Mr. Oda
21   and a Ms. Vann.

22   A.        I thought it would be Ms. Vann.

23   Q.        Okay.  Explaining the lawsuit.  That's my impression.
24   Anybody can look at these if they wish to.

25   A.        Am I allowed to read it?

24

1    Q.        No, there is no reason to read it at this time.    We

2    aren't going to take time to do that right now.

3              MS. JACOBS: Just one more question.

4              THE COURT:    Sure.

5    BY MS. JACOBS:

6    Q.        Tell me again what the nature of your practice is.

7    A.        I am family medicine.    I have been at the hospital

8    for the past thirteen years.    I am very loyal to this hospital

9    and, even now that they are suing me, I still admit patients

10   because it is my patients.    I care for my patients.    So I do my

11   own.    I am not employed by them.    I am not getting any help

12   from them, not even advertising.    I am not getting anything

13   from them.

14   Q.        Did you say this is a weight-loss clinic?

15   A.        It is wellness and weight loss, yes, ma'am.

16   Q.        Is the weight loss something that is reimbursed by

17   insurance?

18   A.        It is reimbursed when I have a diagnosis.

19   Q.        Do you also have patients who seek that treatment

20   that aren't reimbursed by insurance?

21   A.        They pay their – it is all included in the accounts

22   receivable that we have.

23   Q.        So you have accounts receivable that aren't just

24   insurance; is that true?

25   A.        Right, uh-huh, we have private patients.

25

1      MS. JACOBS:  We are going to need a complete list of

2   accounts receivable on the breakdown, Mr. Shinbaum.

3   BY MR. HAMM:

4   Q.      Dr. Victoria, let me ask this.  For those that are

5   outside of insurance coverage, or Medicare and Medicaid

6   coverage, are you continuing to render service for those people

7   pursuant to your agreement with them?  Has that money been

8   earned by you?

9   A.      Are you talking about private pays?

10  Q.      Yes.  Do those people pay as they come in and see

11  you?

12  A.      Right.

13  Q.      Or do they put a lump –

14  A.      No, it is –

15  Q.      As they come in?

16  A.      It is just office visit.

17  Q.      Okay.  Does anybody come by and put a large amount of

18  money with your practice?

19  A.      No.  The most is like fifty dollars or thirty-five or

20  not even a hundred dollars.

21      MS. JACOBS: And this is continued to November 29?

22      MR. HAMM: November 29 at nine o'clock.  If anybody

23  wants to look at these letters, they are welcome to.  Do you

24  have extra copies of these or not?

25      MS. VICTORIA: I do.

26

1          MR. HAMM: Can I have these?

2          MS. VICTORIA: Yes, sir.

3          MR. HAMM: It explains the lawsuit.  Are there any

4    other creditors here for Dr. Victoria?

5          (No response.)

6          MR. HAMM: Dr. Victoria, this hearing is continued

7    until the 29th of November at this same hour, same room.  There

8    are things that we have asked between you and your attorney to

9    provide and we will ask that those be provided.  Try to do it

10   within a couple of weeks where we and the bankruptcy

11   administrator's office can do what they need to do before

12   November 29 where that hearing will not have to be continued

13   again.

14         Okay.

15         MS. VICTORIA: Yes, sir.

16         MR. HAMM: Dr. Victoria, let me ask today do you owe

17   any child-support, alimony or property settlement pursuant to

18   a divorce decree?

19         MS. VICTORIA: No, sir.

20         MR. HAMM: Did you receive the statement of information

21   provided earlier?

22         MS. VICTORIA: Yes.

23         MR. HAMM: Do you have any questions on that?

24         MS. VICTORIA: No, sir.

25         MR. HAMM: And do you not have a driver's license?

27

1         MS. VICTORIA: I dropped it in my son's – he's coming

2    with that.

3         MR. HAMM: You can bring it on the 29th also.  This

4    hearing is continued.

28

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


 /s/ Patricia Basham

Patricia Basham, Transcriber

Date:  August 13, 2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

---

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| Deloris V. Victoria, | ) Case No. 06-31225 |
| | ) Montgomery, AL |
|     Debtor. | ) December 15, 2006 |

---

TRANSCRIPT OF 341 MEETING OF CREDITORS


APPEARANCES:

Daniel G. Hamm, Trustee
The Law Offices of Daniel G. Hamm
560 South McDonough St., Ste A
Montgomery, AL 36104

Richard D. Shinbaum
Shinbaum, Abell, McLeod & Vann
P.O. Box 201
Montgomery, AL 36101

Tina Hayes
Bankruptcy Administrator's Office
One Church Street
Montgomery, AL 36104

Brad Hightower
Christian & Small LLP
1800 Financial Center
505 North 20th Street
Birmingham, Alabama 35203



---

| | |
|---|---|
| Transcriber: | Patricia Basham |
| | 6411 Quail Ridge Drive |
| | Bartlett, TN  38135 |
| | 901-372-0613 |


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

1           MR. HAMM: Dr. Victoria, my name is Dan Hamm.  I happen

2      to be the trustee assigned to your case on the docket.  First

3      of all, let's begin by raising your right hand.

4                (DELORIS V. VICTORIA, DEBTOR, PREVIOUSLY SWORN)

5           MR. HAMM: This hearing was continued for a variety of

6      reasons.  Let me get your name, please.

7           MR. HIGHTOWER: Brad Hightower on behalf of Greenville

8      Hospital.

9           MR. HAMM: Okay.  And we have Tina Hayes with the

10     bankruptcy administrator's office here and your attorney, Mr.

11     Shinbaum.

12                          EXAMINATION

13     BY MR. HAMM:

14     Q.       I have got some documents that were provided to our

15     office with respect to your accounts receivable that were owed

16     to the business, and I don't have the petition date with me

17     right here.

18          MR. SHINBAUM: 25 of September.

19          MR. HAMM: 9-25, okay.

20     Q.       We asked for some information regarding some accounts

21     receivable and we received some documents.  I assume or presume

22     that you provided these to Mr. Shinbaum's office.  Let me show

23     you a document that the first page, it looks like about a – I

24     think it is a thirty-four page document or thirty-four pages.

25          MR. HAMM: First of all, Ms. Hayes, did you receive a

3

1    copy of this?

2             MS. HAYES: I got a copy this morning.

3    Q.         Can you tell me what – and this has got – is that

4    Nexium?  Is that what that says?

5    A.         Yeah.   It is probably just –

6    Q.         It appears to be some type of sticky note on the

7    front that says Nexium.  Can you tell me what that document is,

8    what all of that is?

9    A.         It's not from me.

10   Q.         I am sorry.

11   A.         It's not from me.

12   Q.         Who is that from?

13   A.         It's not from me, this first page.

14   Q.         Can you tell me what the next page is?

15   A.         These are the taxes.

16   Q.         I am sorry?

17   A.         These are the taxes.

18   Q.         Okay.

19   A.         They are all of the taxes. Some of this stuff, not

20   all – they are all taxes.

21   Q.         It's all information related to taxes, okay.   The

22   next item that I have is I think about a four to six page

23   document that has in the upper, left-hand corner, Cahaba GBH-

24   AL.  Can you tell me what this document is?

25   A.         Medicare payments.

4

1    Q.       I am sorry?

2    A.       Medicare payments.  Medicare and Blue Cross.

3    Q.       If you will look at the top of the first page of that

4    document, does it start off page two of two?  Is page one in

5    there?

6             (Pause)

7             (Inaudible conversation between counsel.)

8             MR. HAMM:  That is correct.  Mr. Shinbaum is correct

9    about that.  I am sorry.  Why don't you request them of Mr.

10   Shinbaum.  That might be the best thing to do.

11            MR. SHINBAUM: I would have to (inaudible) but it can

12   be done.  I would have to redact the patients' names.

13            MR. HAMM: You are right about that.

14            (Inaudible)

15   Q.       Could I take a look at that?  What is this?  What

16   does this document reflect?  Is this a remittance advice from

17   Cahaba?

18   A.       Medicare.

19   Q.       I am looking at the bottom of page two of two, bottom

20   left, and it says billed amount, sixteen hundred and twenty-

21   three dollars; is that correct?

22   A.       Uh-huh.

23   Q.       And over to the right, it says check amount, one

24   thousand and forty-one dollars?

25   A.       Uh-huh.

5

1    Q.        How often do you receive –

2    A.        Medicare is every week.

3    Q.        Every what?

4    A.        Every week.

5    Q.        Okay.  Would this reflect the activity for one week?

6    A.        One week.

7              MR. SHINBAUM: Let me help you, Dan.  I don't think it

8    reflects the activity for one week; it reflects what was paid

9    for one week.

10   Q.        Yes.  That would be the payment activity for one

11   week; is that correct?  You only received a thousand and forty-

12   one dollars from Cahaba for that week?

13   A.        Uh-huh.

14   Q.        Can you tell me when you would have received that

15   amount of money; what date you would have received that amount

16   of money?

17   A.        It is usually ten days after –

18   Q.        Well, I don't have that first page.  That was part of

19   my question.  I don't see where I have the first page.  What

20   date have you got reflected on your documents?

21   A.        On 10-28.

22   Q.        You received those monies on 10-28?

23   A.        10-28.

24   Q.        Do you have – if you receive this each week, they pay

25   each week, then you would have received some money prior to

6

1    October 28; right?

2    A.         Yeah.

3    Q.         Do you have any idea how much you would have received

4    prior to October 28?

5              MR. SHINBAUM: Is that the Blue Cross?

6              MR. HAMM: No, this is Cahaba.

7              MR.  SHINBAUM:  Blue  Cross  handles  Medicare  and

8    Medicaid.

9              (Inaudible)

10             MR. SHINBAUM: Date of service is referenced here in

11   this column.  Referenced in this column over here is date of

12   service.  (Inaudible) It is like this should have from 10-2,

13   okay.  It has been service from 9-6, 9-7, 8-11, 8-31, 8-23, 9-

14   6, 9-7, 8-31, 8-11, 8-23, 9-4, 9-6 and 9-20.  So that entire

15   check of six fifty-five seventy-three should have come to you.

16             MR. HAMM: Right.

17             MR. SHINBAUM: Because all of the service was done pre

18   bankruptcy but paid after bankruptcy.  And then if you go to –

19             MR. HAMM: What date are you looking at right now?

20             MR. SHINBAUM: 10-2.

21             MR. HAMM: Have these been provided to our office?

22             MR.  SHINBAUM: Yes, these were all provided.  There

23   were four stacks on faxes.

24             MR. HAMM: I have got three and a four.

25             MR. SHINBAUM: I will go back and re-fax again.

7

1          MR. HAMM: How many items did you get, Ms. Hayes?

2          MR. HAYES: I will look at these.

3          MR. HAMM: But there were four separate attachments?

4          MR. SHINBAUM: Four separate attachments.

5          MR. HAMM: I only received three.

6          MR. SHINBAUM: Okay.  I will go back and redo it, then.

7          MR. HAMM: Because these are the three items that I

8    received.

9          MR. SHINBAUM: There were four because it took me four

10   groups to do it.

11         MR. HAMM: Okay.

12   Q.       Dr. Victoria, other than from Cahaba - that check

13   comes from Cahaba; is that correct?

14   A.       Uh-huh.

15   Q.       Other than Cahaba, who else would you receive money

16   from?

17   A.       Blue Cross.

18   Q.       Blue Cross Blue Shield.

19         MR. SHINBAUM: Also there would be Medicaid.

20         MR. HAMM: Right.

21         MR. SHINBAUM: Alabama Medicaid.  This is Medicare.

22   Then there would be Medicaid payments and then there would be

23   the Blue Cross Blue Shield William Berkley's, which are these.

24   Q.       Dr. Victoria, how do you determine how much money is

25   owed to your practice?

8

1    A.        We have in our office, we have this.

2    Q.        Could I look at that?

3    A.        Yes.

4    Q.        Is it broken down into how this amount is determined?

5    A.         No, that's the charges and the payments to the

6    office.  (Inaudible)

7    Q.        How do you determine which patient owes you what sum

8    of money?

9    A.        Basically about ninety-nine percent is insurance, so

10   –

11   Q.        But how do you tell what patient owes you what money

12   so it can be accounted?

13   A.         Yeah, we do have the number.  I gave you that.

14   (Inaudible)

15   Q.        Do you have a ledger for each patient that shows when

16   services were rendered to that patient and what was billed to

17   that patient?

18   A.        It is in the report but it's, as I said, after the

19   insurance payment, that's with our ledger for them.

20   Q.        Do you have the actual ledgers?  I want a copy of the

21   actual ledgers, that listing that would reflect how much you

22   were owed at any particular time.

23   A.        Yeah, because, as I said, once we have the payment,

24   then she does whatever payment of that, the co-pay they owe us,

25   that's the list of the patients.

9

```
1    Q.        Can I come down to your office this afternoon?

2    A.        Oh, I am on my way to Atlanta.

3    Q.        When are you going to be back?

4    A.        I will be back Monday.

5    Q.        You are going to be in the office Monday?

6    A.        Yeah, sure.

7    Q.        I want to come by your office Monday, okay, and I

8    want to see - if I walked in the door, I want to know how I am

9    billed, okay, how you bill Blue Cross, everything.  I want to

10   know the entire procedure.

11            MR. SHINBAUM: Well, could we coordinate that visit

12   where I could attend also?

13            MR. HAMM: Okay.

14            MR. SHINBAUM: It might short-cut some of this.

15            MR. HAMM: Okay.

16            MS. HAYES: Do you do your billing by hand or is it in

17   a software program?

18            DR. VICTORIA: It is in a software, yes.

19   Q.        What kind of program do you use?

20   A.        We have (inaudible) System of Florida that's used as

21   the summary report.

22            MR. SHINBAUM:  I need to know the programming you are

23   using.  I need a copy of the program, okay, to give to Dan.  I

24   need a copy of the program and I need all data for my office so

25   I can show him and I can transcribe it.
```

10

1          MR. HAMM: Right.

2          MS. HAYES: It will show postings.

3          (Inaudible)

4          MR. SHINBAUM: She is about seven or eight thousand a

5     month is her income.

6          MR. HAMM: Net or hers?

7          MS. HAYES: Net, I think.

8     Q.        Dr. Victoria, we are reflecting an income of about

9     fifteen thousand dollars a month.  Where did you come up with

10    that figure?

11    A.        As I said, this is the listing of –

12    Q.        Can I look at this?

13    A.        Uh-huh.  Yes.

14    Q.        This is the total of your insurance payments?

15    A.        September.

16    Q.        I am sorry?

17    A.        September payments.

18    Q.        Right.  Who prepares this?

19    A.        We have it in the office.

20    Q.        My question is who prepares this?

21    A.        We have a lady that does it.

22    Q.        Okay.  Where is this lady?

23    A.        She is in my office.

24    Q.        Okay.  Do you deposit this money into your bank

25    account?

11

1    A.        Uh-huh.

2    Q.        Every money that comes into your office is deposited

3    into your bank account?

4    A.        Bank account.

5    Q.        Now does your husband practice with you?

6    A.        No.

7    Q.        He does not.  Where is his office located?

8    A.        It's in Luverne.

9    Q.        And none of his patients come to your office?

10   A.        No.

11   Q.        Okay.  Do you all have a joint checking account?

12   A.        (Inaudible)

13   Q.        I am sorry?

14   A.        No, uh-uh.

15   Q.        Tell me about how you, from your business standpoint

16   and your personal standpoint, tell me how you do your banking.

17   A.        It is all deposited in my bank and then we pay out

18   our expenses through that account.

19   Q.        From this account?

20   A.        Right.  And I have supplied them with whatever

21   expenses we have every month.

22   Q.        Okay.  I am not worried about the expenses right now.

23   I am trying to figure out income.

24   A.        (Inaudible)

25   Q.        And what bank account is this money deposited into?

12

1    A.        It's Whitney Bank.

2    Q.        Whitney Bank?

3    A.        Yes.

4    Q.        Is it deposited into an account – what name is on

5    that account?

6    A.        It's Deloris Victoria.

7    Q.        Deloris Victoria?

8    A.        Uh-huh.

9    Q.        P.C. or just Deloris Victoria?

10    A.        Just Deloris Victoria.

11    Q.        Let me ask how much is in that account today?

12    A.        It's about three thousand.

13    Q.        I am sorry?

14    A.        About three thousand.

15    Q.        Have you made any deposits into that account

16    recently?

17    A.        We have Medicaid.  It's automatic.  So yesterday it

18    was deposited.

19    Q.        Okay.  Does this include the Medicaid deposit?

20    A.        Medicaid, yeah.

21    Q.        Okay.  So of course you aren't making that deposit;

22    that is wired into the account, right?

23    A.        Uh-huh.

24    Q.        It comes into the account automatically.  Does

25    anybody else pay you automatically into that account?

13

1    A.       That's the only one.

2    Q.       Medicaid in the only one?

3    A.       Yes.

4    Q.       How about Blue Cross Blue Shield?

5    A.       That's like a check.

6    Q.       It is a separate check?

7    A.       Yes.

8    Q.       Okay.   Is this a fairly average month, twelve

9    thousand, that you receive into that account?

10   A.       (Inaudible)

11            MR. SHINBAUM: That is October.

12   Q.       And this is all of the money coming into your

13   practice?

14   A.       Uh-huh.

15   Q.       And you pay your expenses how?   Do you write a

16   personal check?

17   A.       We just write it from the bank.

18   Q.       From the same bank account?

19   A.       Uh-huh.

20   Q.       And you pay the office expenses from that?

21   A.       Right, uh-huh.

22   Q.       How long does it take these companies to pay you?

23   Let's say Blue Cross Blue Shield, if somebody comes in for

24   service today, how long will it take before that check –

25   A.       Seven to fourteen days.

14

1    Q.        How about Tricare?

2    A.        Tricare is two months, three months.

3    Q.        I notice you have got somebody labeled just Care, C-

4    A-R-E.

5    A.        Care is Medicaid.

6    Q.        How long does it take there?

7    A.        It is seven to fourteen days.

8    Q.        Blue Cross Blue Shield, seven to fourteen days?

9    A.        Uh-huh.

10   Q.        Care, seven to fourteen days.

11   A.        (Inaudible)

12   Q.        I notice you are receiving a check from the

13   Department of Treasury.  What would that be for?

14   A.        We have patients that are – I guess that works for

15   the government.

16   Q.        Okay.  But the government wouldn't be paying their

17   medical expenses; would they?

18   A.        (Inaudible)

19   Q.        How about Life Investors, how long does it take them

20   to pay?

21   A.        Two to three months also.  If you notice in there, my

22   private insurance are around the ninety-five percent and then

23   Blue Cross is thirty, Medicare is thirty, and Medicaid is

24   thirty.  So those are the major players.

25   Q.        Blue Cross –

15

1    A.        Medicare, Medicaid, which is thirty/thirty percent.

2    Q.        Okay.  (Inaudible), how long does it take them?

3    A.         Three months.  As I said, most of the private

4    insurance are two to three months.

5    Q.        I notice we have got office payment.  Is that where

6    people came in and actually paid you out of their pocket?

7    A.        That's the one that I was showing to him that we log

8    it in.

9    Q.        Okay.

10    A.        The co-pays and whatever they – the twenty percent

11    (inaudible).

12    Q.        Okay.  I see.  So the total charges would be the

13    total charges to the patient as a whole.  The payment may be

14    from the individual, this column right here that reflects

15    payment?

16    A.        This column is our co-pays and the twenty percent

17    that's from whatever they have, and then – that's the reason

18    why we can only go how much, you know, they allow us.  That's

19    the explanation of services.

20    Q.        Okay.  But you have one bank account?

21    A.        One bank account.

22    Q.        Do you have an automobile?

23    A.        We have (inaudible).

24    Q.        I am sorry.

25    A.        I don't have my own.

16

| 1 | Q. | Okay.  How did you get here today? |
|---|----|-----|
| 2 | A. | (Inaudible) |
| 3 | Q. | How many automobiles does your husband have? |
| 4 | A. | He's got three. |
| 5 | Q. | What kind of cars are they? |
| 6 | A. | I drive it, too, but it's just my kids' cars. |
| 7 | Q. | What kind of cars are they? |
| 8 | A. | He has got some Mercedes and a Porsche. |
| 9 | Q. | Do you know the numbers on the back of the Mercedes? |
| 10 | A. | (No response.) |
| 11 | Q. | Do you know if they are paid for? |
| 12 | A. | One is paid for. |
| 13 | Q. | One is? |
| 14 | A. | Uh-huh. |
| 15 | Q. | Tell me about any real estate you may have owned in |
| 16 |    | the last four or five years.  Have you – |
| 17 | A. | Just our home. |
| 18 | Q. | The home in Greenville? |
| 19 | A. | Yes. |
| 20 | Q. | Anything else? |
| 21 | A. | We have a townhouse in Atlanta that's my husband's |
| 22 |    | and we got it for my daughters. |
| 23 | Q. | Okay.  Has your name ever been on the deed? |
| 24 | A. | No, sir. |
| 25 | Q. | It has not? |

17

1    A.        No, uh-uh.

2    Q.        And you are pretty certain of that?

3    A.        (No audible response.)

4    Q.        Anything else?

5    A.        (No audible response.)

6    Q.        Do you know the address of the townhouse in Atlanta?

7    A.        375 Highland Avenue.

8    Q.        Okay.  And is that an Atlanta address?

9    A.        Uh-huh.

10   Q.        Any other real estate?

11   A.        Did we say the townhome –

12             MR. SHINBAUM: You said the townhome and the house in

13   Greenville.

14   A.        We have a timeshare.

15   Q.        Right.  Anything else?

16   A.        No, sir.

17   Q.        Would that be the Isle of the Valley?

18   A.        Yes.

19   Q.        What's the nature of your husband's practice?

20   A.        He's a surgeon.

21   Q.        Do you use an accountant in your practice?

22   A.        We do.

23   Q.        Who do you use?

24   A.        We have Kathy Purdue for Luverne.

25   Q.        Kathy Purdue?

18

1    A.      Uh-huh.

2    Q.      And she is from Luverne, Alabama?

3    A.      Yes.

4    Q.      How many employees do you have that work with you?

5    A.      I have two and one part-time.

6    Q.      You have two full-time employees?

7    A.      Yes.

8    Q.      Have all of the monies that you have received in your

9    practice, have they been deposited into your account, your

10    Deloris Victoria account?

11    A.      Correct.

12          MR. HAMM: Have you all got anything?

13          MR. HIGHTOWER: I have some questions for her.

14    BY MR. HIGHTOWER:

15    Q.      Dr. Victoria, my name is Brad Hightower.

16    A.      How are you doing today?

17    Q.      I represent Greenville Hospital. There was a

18    gentleman here named Greer Mallette the last time that you came

19    and asked you some questions, and I am not certain what all he

20    asked you. But if I ask you the same question again, I

21    apologize.

22          MR. HIGHTOWER: Do you have a copy of her petition and

23    schedules that she could look at?

24          (Pause)

25    Q.      Before I get to that, you have a medical office space

19

1    leased with Greenville Hospital; is that correct?

2    A.        (Inaudible)

3    Q.        Are you aware it is not – you didn't list it in your

4    bankruptcy petition and schedules.  There is a space – in what

5    you have got in your hand, there is a space in there for

6    listing of any leases and there is nothing in there, it is not

7    listed.  Are you aware that it is not listed in there?

8    A.        (No response.)

9    Q.        What is your intention regarding that lease?  Do you

10   plan on staying in the lease or do you plan on breaching that

11   lease?

12   A.        I personally heard that we had to get out of there.

13        MR. HIGHTOWER: Are you saying that it is her intention

14   to reject the lease?

15        MR. SHINBAUM: Right, unless you all want to

16   renegotiate.

17        MR. HIGHTOWER: Can she go ahead and file some sort of

18   statement of intention saying that she rejects the lease?

19        MR. SHINBAUM: Okay.  He wants to know if you want to

20   reject the lease.  Okay.  I will talk to you in a second.

21   Q.        Have you been subleasing the space to anyone else?

22   A.        No.

23   Q.        It was my understanding that the lease may have been

24   – the space may have been subleased to a Dr. Prayer and a Dr.

25   Tomkins.

20

1    A.        Yeah, he comes to my office maybe once in two months

2    but it is nothing that's his.   (Inaudible) with my practice.

3    Q.        So you allow others to use the space?

4    A.        Right.   It's for courtesy because he sees our

5    patients.  I am not concerned about the business part; I am

6    concerned about my patients.

7    Q.        Do you charge these doctors any amount of money?

8    A.        No.

9    Q.        You said that your husband owns a townhouse in

10   Atlanta that was purchased for your –

11   A.        Yeah, and I didn't have anything to do with it.  It

12   is my husband's.  It is not mine.

13   Q.        Let me ask you a few questions about it, if you don't

14   mind.  How much was the purchase price of the townhouse?

15   A.        Well, I didn't think it is your business but –

16             MR. HAMM: Go ahead and answer it if you know.  If you

17   don't know, you don't know.

18   A.        I think about two hundred and something.

19   Q.        When was it purchased?

20   A.        My daughter was in school and that's why he bought

21   it, for my daughter.

22   Q.        Do you know about what dates it was purchased?

23   A.        2002, I think.

24   Q.        And I know you said that it was purchased by your

25   husband but how was it paid for?

21

1    A.        I am paying the rent because I do have an office also

2    in Atlanta at the time, so I pay the rent, so, in turn, I pay

3    the mortgage.

4    Q.        It has a mortgage on it?

5    A.        Right.

6    Q.        What's the amount of the mortgage?

7    A.        About sixteen hundred.

8    Q.        The total debt on the mortgage.  Is it financed

9    entirely?  Did you make a down-payment on this townhouse?

10    A.        He did.

11    Q.        Do you know about how much?

12    A.        I think about fifty thousand.

13    Q.        So there is approximately a hundred and fifty

14    thousand dollar mortgage after that payment?

15    A.        (No response.)

16    Q.        How much is owed on the mortgage today?

17    A.        About a hundred thirty, a hundred forty.

18    Q.        And you said that you helped to pay the mortgage or

19    is your husband paying the mortgage?

20    A.        Yes, I am renting it because I use it when I go to

21    Atlanta for the other office.

22    Q.        You rent the space, you rent the townhouse?

23    A.        Right.

24    Q.        From your daughter?

25    A.        Yes.

22

1    Q.        And you pay your daughter how much?

2    A.        About –

3            MR. HAMM: Wait a second.  Do you rent it from your

4    husband or your daughter?

5            DR. VICTORIA: Well, it is kind of like both.

6            MR. HAMM: Your husband owns the property?

7            DR. VICTORIA: Right.

8            MR. HAMM: But the rent is received by whom?

9            DR. VICTORIA: I guess it is received by him because I

10   pay directly to the mortgage company .

11           MR. HAMM: The rent is how much again?

12           DR. VICTORIA: About sixteen hundred.

13           MR. HAMM: So when you make out a check for that rent,

14   who does the check go to?

15           DR. VICTORIA: The checks goes to the mortgage company.

16   BY MR. HIGHTOWER:

17   Q.        But you said you are renting it from who?

18   A.        Huh?

19   Q.        Who are you renting it from?  Is there a written

20   agreement or is it just an oral agreement?

21   A.        Verbal, yes.

22   Q.        Verbal agreement.  And who is the agreement made

23   with?

24   A.        My husband and my daughter.

25   Q.        Look at that stack of paper your lawyer handed you.

23

1    You can just hold onto it, if you don't mind.  If you would

2    flip a couple of pages until you see at the top "Schedule-A,

3    Real Property."  Your home where it says in the column listed

4    husband and wife, joint or community, it should be over towards

5    the right-hand side of the page, there is just a dash there.

6    It doesn't say anything.  It doesn't indicate how it is owned.

7    How is the home owned?

8    A.        How much we owe?

9    Q.        You own the home with your husband?

10    A.        Right.

11              MR. SHINBAUM: They own it jointly.

12    Q.        Have you always owned it jointly?

13    A.        That house, yes.

14    Q.        Do you own any property that is located outside of

15    the U.S.?

16    A.        No, I don't.

17    Q.        Do you have family, extended family, outside of the

18    country?

19    A.        Yes.

20    Q.        Have you transferred any money or property to any of

21    your family members in the last two years?

22    A.        No.

23    Q.        None?  Have you given any gifts to them?

24    A.        (No audible response.)

25    Q.        On your mortgage and on your home that is listed in

24

1    Schedule-A, you have a four thousand dollar a month mortgage

2    listed as an expense.  What is the term, the number of years

3    over which you have to pay your mortgage back?

4    A.      I think it has been like about ten years.

5    Q.      Is it a fifteen-year mortgage?

6    A.      It must be.

7    Q.      If you are paying four thousand dollars a month on a

8    fifteen-year mortgage, it seems a little bit high for a

9    fifteen-year mortgage when the mortgage debt is only two

10   hundred and ninety thousand dollars.

11   A.      I don't know.

12   Q.      Are you paying extra on it each month or is that the

13   regular monthly payment?

14   A.      It is the regular one.  My husband has been paying

15   it.

16   Q.      Your husband pays it.  Your husband pays four

17   thousand dollars a month on the mortgage and he has, you think,

18   about ten years left on the mortgage?

19   A.      Yes, I think.

20   Q.      If you would flip to Schedule-B which is titled

21   "Personal Property," do you see listing number five where it

22   says books, pictures, other art objects, antiques, et cetera?

23   A.      Okay.  Books, pictures.

24   Q.      Do you see that listing?

25   A.      Uh-huh.

25

1     Q.      You marked none.  Do you have anything that falls

2    under that category that's your property?

3     A.      Not really to mention.

4     Q.      Do you have any art work?

5     A.      No.

6     Q.      Do you have any collectibles that are worth any

7    value?  None?

8     A.      None.

9     Q.      If you would flip to the next page, number thirteen

10    says stock and interest in incorporated and unincorporated

11    businesses.  You checked none.  Is that correct?

12     A.      None.

13     Q.      Is your business incorporated?  What type of

14    business?  Do you have a corporation or any legal entity that

15    your business operates under?

16     A.      It was incorporated and then they switched it to a

17    limited partnership.

18     Q.      What is it?

19     A.      It is a limited partnership now.

20     Q.      Do you have any stock in it?

21     A.      No.

22     Q.      Number fourteen says interest in partnerships or

23    joint ventures.  You checked none.  You said that your business

24    is a partnership; is that correct?

25     A.      It is an LLC.

26

1    Q.        Your business is a limited liability company?

2    A.        Uh-huh.

3    Q.        What is the name of it?

4    A.        Medical Health Services of Alabama.

5    Q.        Number twenty-five is automobiles, trucks, trailers,

6    and then you previously said that your husband has two Mercedes

7    and a Porsche.  Which one of those do you drive?

8    A.        Sometimes I drive - I drive (inaudible).

9    Q.        You drive which one?

10   A.        Everything I drive.

11   Q.        Do you have a primary one that you drive the most?

12   A.        I just catch a ride from everybody.  I just work too

13   much.

14   Q.        There is not one of the three that you primarily use?

15   A.        No.

16   Q.        Why is it that all of the cars that are owned in your

17   family are all owned by your husband instead of you?

18   A.        I don't know.  He just wanted to have his name on

19   those.

20   Q.        Why is that?

21   A.        I just don't have any money to buy it.

22   Q.        You don't have any money to purchase a car?

23   A.        No.

24   Q.        Later in the paper work that you filed, you show that

25   you have income - you show you have gross income of fifteen

27

1    thousand dollars a month and after you pay all of your bills,

2    that you have left over one thousand, eight hundred and ninety

3    dollars a month.  Is that correct?

4    A.        (No response.)

5    Q.        Certainly that's money to pay for a car; isn't it?

6    A.        (No response.)

7    Q.        You don't think so?

8    A.        (Inaudible)

9           MR. HIGHTOWER: Did she provide a list of all of her

10   jewelry?  Was that previously requested?

11          MR. HAMM: I have not requested such.  I am not aware

12   of requesting such.  I will tell you for your information we

13   have taken some pictures of the outside of the home and the

14   stuff on the inside.  We are going to have that evaluated.  We

15   will make a decision whether to have an appraiser in to

16   evaluate.

17          MR. HIGHTOWER: Are you going to look into her jewelry

18   that she owns other than her –

19          MR. HAMM: That would be part of the items that – yes,

20   that is going to be items that –

21          MR.  HIGHTOWER: Let  me  see  if  I  have  any  other

22   questions.

23   BY MR. HIGHTOWER:

24   Q.        Would you turn to Schedule-F?

25          MR. HAMM: I recall the jewelry coming up and I think

28

1    that you had given the jewelry away; is that correct?

2              DR. VICTORIA: Correct.

3              MR. HAMM: Tell me – well, we will go into that in a

4    second.  I will let you go ahead with your questions.

5              DR. VICTORIA: The reason why we did it is because

6    like, when we went to the Philippines, we just figure out that

7    they should get it.  If something happened to us, it –

8    BY MR. HAMM:

9    Q.        When did you give it away?

10   A.        Probably like a couple of earrings.

11             MR. SHINBAUM: No, no.  When?

12             DR. VICTORIA: when we went to the Philippines in

13   December of last year.

14   Q.        What all did you give away?

15   A.        Maybe a couple of earrings, a couple of rings.  It

16   was not a lot.

17   Q.        And who did you give it to?

18   A.        To my daughters.

19   Q.        And have you got two daughters or one?

20   A.        Two daughters.

21   Q.        Two?

22   A.        Uh-huh.

23             MR. HAMM: Go ahead.

24   BY MR. HIGHTOWER:

25   Q.        Exactly what jewelry was it that you – I asked you

29

1    earlier if you had given any property or money to your family

2    members in the last two years, and you just said that you gave

3    them some jewelry last year.

4    A.        Let me explain to you.  I do not have a recent

5    appraisal, so I would not know exactly if it is still the same

6    amount or if it is higher or whatever.

7    Q.        I didn't ask you how much it was valued.  I just

8    asked you earlier if you had given anything at all to your

9    family members.

10   A.        I am sorry.  But, as I said, (inaudible).

11   Q.        So the correct answer to that question is that you

12   have given them some jewelry?

13   A.        Yeah.

14   Q.        Do you have in your mind an approximate value of the

15   jewelry that you gave them?

16   A.        Less than five thousand.

17   Q.        Now that you have told me that you gave your family

18   some jewelry, is there anything else, money, that you have

19   given them in the last two years?

20   A.        No.

21   Q.        Do you see Schedule-F on your bankruptcy paper work?

22    The first listing is for a creditor named Camden National.  It

23   says it is a line of credit.  Is that a business line of credit

24   or was that for personal purchases?

25   A.        Business.

30

1    Q.        Business?

2    A.        Business.

3              MR. HAMM: Let me interrupt you.  Are you planning a

4    2004 examination?

5              MR. HIGHTOWER: No.  If I can get everything – I assume

6    I can get everything in this –

7              MR. HAMM: Well, generally we don't go with a – a

8    meeting of creditors –

9              MR. HIGHTOWER: Is this a little bit much for you guys?

10             MR. HAMM: Yeah, far more than what we normally do.  I

11   don't want to go through this and then a 2004 examination.  If

12   you are going to do a 2004 –

13             MR. HIGHTOWER: I don't expect to do one unless some

14   information just seems capooie and inaccurate at this point.

15   I can't tell.  I am trying to just get a basis for determining

16   if I need to do one or not.

17             MR. HAMM: Okay.  Generally we limit – okay.  And I

18   know you are asking questions about the assets and liabilities

19   in the 341, but go ahead and let's see where we go.

20             MR. HIGHTOWER: I don't normally do this in most cases.

21             MR. HAMM: I know, and we don't normally do it.  In

22   this case, since Dr. Victoria is up here, and we put it at the

23   end, but I don't want to go through this and then you come

24   forward and ask for a 2004 examination.  I think that is a

25   little unfair for the way we do it down here.  I will say that.

1          MR. HIGHTOWER: The judge may find that that is not

2    appropriate?

3          MR. HAMM: No.  You are going to be entitled to a 2004

4    exam.

5          MR. SHINBAUM: If you ask for one, he is going to give

6    you one.

7          MR. HAMM: He is going to give you one, but I just

8    don't – I think it is wrong for us to sit here and take her

9    time or take Mr. Shinbaum's time and her time, and I appreciate

10   you coming down, and then coming along and ask for a 2004

11   examination.

12         MR. HIGHTOWER: I understand.  I came the last time,

13   drove down here from Birmingham and no one showed up and no one

14   calling to let me know that no one was coming, and I didn't

15   come down here again, so I would appreciate it if I could just

16   –

17         MR. HAMM: Sure.  Go ahead.

18         MR. HIGHTOWER: I will try to move along a little

19   faster.

20         MR. HAMM: Okay.

21         DR. VICTORIA: Am I allowed to say something?

22         MR. HAMM: When it gets back to your turn.

23         MR. SHINBAUM: Just answer the questions.

24         DR. VICTORIA: Okay.

25   BY MR. HIGHTOWER:

32

1    Q.      Can you look at Schedule-J for me?  These are the

2    listing of your expenditures.

3    A.      Uh-huh.

4    Q.      You list for transportation, not including car

5    payment, seven hundred dollars a month.  How much

6    transportation do you – do you travel a lot for your practice?

7    A.      I travel to Atlanta.

8    Q.      Is this for gas mostly?

9    A.      Yes, and my husband drives from and to hospitals, two

10    hospitals.

11    Q.      Okay.  How about charitable contributions of a

12    thousand dollars.

13    A.      Oh, yeah.

14    Q.      Who do you make charitable contributions to?

15    A.      My church and then (inaudible) church that we give

16    money to, and we have my daughter's church that we are giving

17    to her.  That's it.

18    Q.      Okay.

19    A.      And my son's church.

20    Q.      You list your spouse's debts as three thousand, five

21    hundred dollars.  Just roughly what is that for?

22    A.      I think it is more than that.  I think they under

23    estimated it.  I forgot to ask you if this is – what's this, a

24    business one or –

25           MR. SHINBAUM:  If you will recall, that was after – it

33

1    was thirty-five thousand combined income estimate and then you

2    gave us the estimate of business expenses –

3              DR. VICTORIA: Okay, okay.

4              MR. SHINBAUM: With a total income of about fifteen

5    four a month.

6              DR. VICTORIA:  (Inaudible)

7    BY MR. HIGHTOWER:

8    Q.        So that three thousand, five hundred dollars is for

9    all of your husband's expenses?

10   A.        I think – I can't figure out because I know that he

11   pays the bank (inaudible).  I am trying to figure out what all

12   is included in there.  I think the home is included, plus the

13   cars is  included.   These are  like  insurance  for  the  car,

14   insurance for the house.

15   Q.        You list separately a twelve hundred dollar month

16   payment for auto insurance.  I assume that means it is not

17   included in the thirty-five hundred dollars.

18   A.        Okay.  (Inaudible)

19   Q.        One last question for you.  You list, after all of

20   your income and expenses are considered, you listed at the end

21   of the month that you have net income of one thousand – it's at

22   the very bottom of that page – one thousand, eight hundred and

23   ninety dollars a month.  Is that what you see at the bottom of

24   that page in the right-hand side?  Is that number accurate?

25   A.        Approximate.

34

1          MR. HIGHTOWER: Thank you.

2     BY MS. HAYES:

3     Q.        I just have a few.  My name is Tina Hayes and I am

4     with the bankruptcy administrator's office.  I just have some

5     follow-up questions.  I was not here during your initial

6     testimony.

7          MS. HAYES: Richard, I do think some of these schedules

8     are going to have to be amended.

9     Q.        The firearms, are those in your name or your – do

10    those belong to you or your husband?

11    A.        My husband.

12    Q.        And do you know approximately how many he owns?

13    A.        No.

14    Q.        And do you have life insurance?

15    A.        Uh-huh.

16    Q.        Is that term or whole life?

17    A.        It is term.

18    Q.         Now those weren't listed originally in your

19    schedules.  How much approximately at the time you filed your

20    bankruptcy was owed to you in accounts receivable?

21    A.        I would say twelve thousand because that's monthly

22    income.

23    Q.        That's not including the outstanding amounts, the

24    twenty percent of what insurance doesn't cover?

25    A.        (Inaudible)

35

1   Q.        Okay.  The notes from last time said you had accounts

2   receivable from about thirty to forty thousand dollars a month.

3   A.        I don't think so.

4           MR. SHINBAUM: We used that, Tina, because the accounts

5   receivables, the way they were figured is she may be billing a

6   client of Medicaid twenty thousand dollars and they may only

7   allow eight thousand in payments.

8           MS. HAYES: Right.

9           MR. SHINBAUM: And you can't get anything else on that.

10          MS. HAYES: If you will just clarify that.

11          MR. SHINBAUM: Okay.

12          MS.  HAYES:  And  also  in  Schedules  D,E,  and  F,

13   particularly Schedules E, where all the taxes are, they don't

14   seem to match up with the documents that you provided to me,

15   and if you could break those down, what is personal and what is

16   business.

17          MR. SHINBAUM: Break it down, okay.

18          MS. HAYES: And Mr. Hightower is going to go through

19   Schedule "F."  What we had put down as consumer, she testified

20   at least one of them is a business debt.  So if you could go

21   through with her and let us know.

22          MR. SHINBAUM: Which one is that?

23          MS. HAYES: On the first one, the only one we got to

24   was Camden National.  It is a line of credit.

25          MR. SHINBAUM: It is line of credit, yeah.

36

1          MS. HAYES: And we had it as a consumer and it is a

2     business debt.

3          MR. SHINBAUM: I have the note for you.  Did I give you

4     the note?

5          MS. HAYES: No.

6          MR. SHINBAUM: Okay.

7          MS. HAYES: And then you were going to talk with her

8     about the credit card debts.

9          MR. SHINBAUM: Yes.

10    BY MS. HAYES:

11    Q.        And you testified you had charitable contributions

12    each month with some churches?

13    A.        Uh-huh.

14    Q.         Is that a monthly tithe that you give to those

15    churches?

16    A.        Sometimes it is six hundred and sometimes it is five

17    hundred.

18         MS. HAYES: Richard, I think on the statement of

19    information that needs to be disclosed under her gifts.

20         MR. SHINBAUM: Okay.  Got you.  Get me copies of your

21    checks for the last three months.

22         MS. HAYES: And all of the jewelry that went to the

23    Philippines back in December needs to –

24         MR. SHINBAUM: It wasn't the Philippines.

25         MS. HAYES: Okay.  Wherever her daughters are.

37

1          MR. SHINBAUM: He asked if there was anything given to

2     the family in Philippines and the answer is no.  Her daughters

3     are not in the Philippines.

4          MS. HAYES: Your daughters are stateside?

5          MR. SHINBAUM: Yes.

6          MR. HIGHTOWER: If I can ask her if she has given

7     anything to her family at all.

8          MR. SHINBAUM: Okay.  Well, you asked a second time.

9          MR. HIGHTOWER: Her answer was that she had not other

10    than the jewelry.

11         MR. SHINBAUM: Yes.

12         MS. HAYES: That's all I have.

13    BY MR. HAMM:

14    Q.         Dr. Victoria, let me ask a couple of quick questions.

15    You rent part of the townhouse in Atlanta from your daughter?

16    A.         Yes.

17    Q.         That is essentially what you are saying.  What do you

18    use the townhouse for there?

19    A.         I stay there because I work on Friday and Saturday,

20    so I stay at the townhouse.

21    Q.         Oh, you work in Atlanta on Friday and Saturday.

22    Where do you work in Atlanta?

23    A.         Right now we are in the process of getting another

24    place but (inaudible.)

25    Q.         What did you do there?

38

1  A.        Weight loss.

2  Q.        How long have you been doing that?

3  A.        I have been doing it – it's all incorporated in my

4  business because we have income there and I –

5            MR. SHINBAUM:  No, that wasn't the question.  How long

6  have you been doing this at Newman?  That's what he asked.

7  A.        In Newman, it is maybe like three years.

8  Q.        Now where is your daughter's townhouse located?

9  A.        Downtown Atlanta.

10  Q.        And you drive from downtown Atlanta to Newman?

11  A.        Yeah, thirty minutes.

12  Q.        Every?

13  A.        Friday and Saturday.

14  Q.        Does she have a separate room for you?

15  A.        (Inaudible)

16  Q.        How many people are in her family?

17  A.        I am sorry?

18  Q.        How many people are in her family?

19  A.        Oh, she is single.

20  Q.        And what size townhouse is it?

21  A.        It is a three bedroom townhouse.

22  Q.        And how often do you go?

23  A.        I go there every Friday and every other Saturday.

24  Q.        Okay.  Let me ask you, let's be candid, you are

25  making the mortgage payment on that home in Atlanta; is that

39

1    correct?

2    A.    Yeah, it's kind of like the rent.  That's how we put

3    it in –

4    Q.    Your daughter doesn't – does she pay you?

5    A.    She pays for her – for the utilities.

6    Q.    And is she in school there?

7    A.    She graduated.

8    Q.    Okay.  Is she getting her medical practice up and

9    going?

10    A.    She is being trained.

11    Q.    Okay.  And no one else lives with her?

12    A.    Not right now.  (Inaudible)

13    Q.    Does your daughter have a vehicle?

14    A.    Yes.

15    Q.    Does she own that vehicle?

16    A.    Yeah.  It's under my husband's name but she pays for

17    it.

18    Q.    It is not one of those three vehicles, then –

19    A.    Sir?

20    Q.    It is not one of the three vehicles that your husband

21    owns then?

22    A.    (Inaudible)

23    Q.    So there is actually four vehicles.  Is there only

24    four vehicles in your husband's name?

25    A.    He has got (inaudible).

40

1    Q.        So there are five vehicles?

2    A.        (Inaudible)

3              (Off the record)

41

C E R T I F I C A T E

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


        /s/ Patricia Basham

       Patricia Basham, Transcriber

       Date:  August 23, 2007